[No. 9667.    Department Two.    October 30, 1911.]

NATIONAL SURETY COMPANY, *Appellant*, v. JOHN UDD *et al.*, *Respondents.*[1]

FRAUDULENT CONVEYANCES—PREFERENCE—FRAUD OF GRANTOR—PARTICIPATION BY GRANTEE—EVIDENCE—SUFFICIENCY—BURDEN OF PROOF. The evidence is insufficient to warrant the setting aside of a deed as fraudulent as to creditors, although the grantor was converting his real property into money with fraudulent intent to avoid payment of a judgment in a pending suit, where it appears that the grantee, a cousin of the grantor, was also a creditor and took the conveyance in discharge of an antecedent indebtedness, and it was not shown that he had such notice of the pending suit or so participated in the grantor's fraud as to cause him to lose the preference; the burden of proof to establish such notice being upon the plaintiff.

SAME—CASH PAYMENT BY PREFERRED CREDITOR. A preferred creditor does not lose his preference from the fact he made a cash payment of an excess in order to procure payment of his debt, the debtor refusing to make the conveyance without such payment.

[1]Reported in 118 Pac. 347.

NEW TRIAL—NEWLY DISCOVERED EVIDENCE—PROBABLE EFFECT. A new trial for newly discovered evidence should not be granted where the evidence would not affect the result.

Appeal from a judgment of the superior court for Pierce county, Easterday, J., entered December 28, 1910, upon findings in favor of the defendants, after a trial on the merits before the court without a jury, in an action to vacate a deed. Affirmed.

*Roberts, Battle, Hulbert & Tennant*, for appellant.

*Crowl & Comfort*, for respondents.

ELLIS, J.—Action by the appellant, as plaintiff, against the respondents, as defendants, to set aside a conveyance of certain real estate in the city of Tacoma, made by the respondents Bonn and wife to the respondent Udd, as being fraudulent and made for the purpose of preventing the collection of a judgment for $869.30 held by the appellant against Bonn and wife. From a decree in favor of respondents, this appeal is prosecuted.

The assignments of error may be grouped under two heads: (1) That the findings, conclusions, and decree are contrary to the law and the evidence; (2) that the court erred in denying the appellant's motion for a new trial. The following resume of the evidence will disclose the facts:

The respondent Bonn testified that the property in controversy is what he calls his home property; that it is improved with a story and a half house built for one family, but that two families could use it; that he was living in the house, as was also the respondent Udd and his wife; that, prior to the conveyance, Udd, who is his cousin, was boarding with him; that he had borrowed $600 from Udd in December, 1904, and $650 more in 1906; that in October or November, 1909, Udd began demanding payment of this money, and finally proposed that Bonn convey the property to Udd in satisfaction of these debts and for an additional

cash consideration of $700; that the deal was made and the property conveyed to Udd subject to a mortgage of $1,600.

He further testified that, on the same day of the conveyance to Udd, he conveyed to Mathilda Beck, his sister-in-law, five acres of land, known as the Milton property, for $500; that both deals were closed at the same time, in the office of Messrs. Crowl, Evans and Comfort; that the deeds to Udd and Mrs. Beck were then executed and handed to them, and they took their respective deeds away with them, and that he went to the courthouse with Udd and Mrs. Beck to record their deeds. The auditor's record shows that both deeds were recorded on the 25th day of April within one minute of each other. The trial of the action out of which plaintiff's judgment arose began the next day, and the judgment was rendered therein on the 3d day of May, 1910. Bonn further testified that, although Udd was his cousin and living in the same house with him, he had never talked to him about the suit of the surety company against him, except to say that he would surely win it. He also stated that Udd paid him $400 for another lot shortly after the trial of the case against him by the surety company.

The respondent Udd, who had been excluded from the courtroom while Bonn was on the stand, testified to the same state of facts concerning the indebtedness due him by Bonn, of his demanding payment, and the proposition to buy the property in question from Bonn by paying $700, cancelling the debts, and assuming the mortgage. He further testified that the deal was closed in the office of Bonn's attorneys; that Mrs. Beck was there and got her deed at the same time; that on April 25th he took his deed to the auditor's office; that he did not know when Mrs. Beck recorded her deed; that he did not see her in the auditor's office at the time he filed his own deed, and that he did not know how her deed got there. He stated that he was not present at any time when Bonn was talking to Mrs. Beck about conveying the Milton property to her, and that he did not know that Bonn had a suit in

court, but only that he was having trouble to get his money from the contractor. With reference to the other property conveyed to him by Bonn, he stated that this was before the conveyance of the property here in question, and must have been in February, 1910, and that he paid $500 cash for it, notwithstanding the fact that Bonn was then owing him $1,250 and interest, which he was then urging Bonn to pay.

Mathilda Beck testified that she paid $500 to Bonn for the Milton property, and that Bonn brought the deed and gave it to her at her home; that she recorded the deed herself, and that Udd did not go with her; that she recorded it because Bonn told her to do so; and that Bonn did not.tell her that there was any lawsuit coming up against him the next day. The evidence shows conclusively that both the deeds to Udd and to Mrs. Beck were executed on the 21st day of April.

Before the court would be justified in declaring the deed to Udd fraudulent as to creditors it must be satisfied ,that Bonn made it with a fraudulent intent. In view of all of the evidence, that intent on his part can hardly be doubted. He practically admitted it. In testifying concerning the conveyance of the Milton property to Mrs. Beck, when asked how he happened to make that deed on the same day when he made the deed here in question to Udd, he said: "I though I should leave and go to the other state, I need the money, that was my intention." This, taken in connection with his disposition of the remainder of his property to Udd, and the failure to apply any of the proceeds of either sale upon the appellant's judgment rendered a few days later, is strong evidence of a settled design to dispose of all of his property, thus defeating the collection of any judgment which might be rendered in the surety company's suit.

The real difficulty in this case is found in the question, Did Udd have such notice of this design as to make him a party to it? The appellant has cited no authority, but has con-. fined its brief to an argument upon the evidence. It must be

admitted that this case presents a rather remarkable congeries of coincidences, all pointing to an intention on Bonn's part to get all of his property out of his hands before the surety company's suit against him was tried. Apparently he could find no market for his real estate except among his relatives and family connections. He sold to his cousin and his sister-in-law. They both developed a desire to purchase at the same time. The deals were closed and the deeds executed at the same time and place and delivered simultaneously. It is not a little remarkable that this coincidental desire to purchase his real estate on the part of his relatives should be accompanied with the further independent but also coincidental impulse to record the deeds on the same day within one minute of each other, and that that day should chance to be the day immediately preceding the trial of the suit against Bonn, of which suit neither Udd nor Mrs. Beck had any knowledge. It is at least strange that neither Udd, his cousin, who was living in the house with Bonn, nor Mrs. Beck, a sister-in-law, living next door, would know anything of this suit against Bonn. It is also remarkable that Udd and Mrs. Beck each failed to see the other when they filed their deeds with only a minute of interval. This is, as the evidence shows, the shortest period, according to the custom of the auditor's office, marked between the filing of instruments, even when two or more were presented for record by the same person at the same time. Both must have been in the auditor's office at the same time and had to approach the same spot within the same minute. Any one of these coincidences standing alone would probably not speak persuasively, but when marshaled they are more eloquent. In the ordinary conduct of human affairs, such a sequence of harmonies would usually be found to result from design rather than chance.

Giving to all these things the strong evidentiary force which they deserve in this class of cases by reason of the plaintiff usually having to rely on the evidence of hostile witnesses,

they induce a suspicion that the testimony of Udd and Bonn as to the antecedent debts, the payment of the $700, and the lack of knowledge on Udd's part that a suit was pending against Bonn, may have been a fabrication. The suspicion so induced, though strong, is hardly sufficient to warrant us in finding that the antecedent debts did not exist, and that the consideration was not paid, in the absence of any direct evidence or more specific circumstantial evidence to the contrary. But even where a grantee pays full consideration for the property, if he takes with knowledge of the grantor's fraudulent intent, he takes subject to the claims of other creditors. *O'Leary v. Duvall*, 10 Wash. 666, 39 Pac. 163. Bump, Fraudulent Conveyances (4th ed.), § 182. The force of the collateral improbabilities found in the evidence lies mainly, therefore, in their tendency to show that Udd knew, or ought to have known, of Bonn's fraudulent design. Actual knowledge in such a case is not essential. Bump, Fraudulent Conveyances (4th ed.), § 184.

This rule, however, applies with its full force only in cases of a conveyance without consideration, or to a purchaser for a cash consideration paid at the time of conveyance, and not to a case where the consideration is wholly or mainly an antecedent debt. It is the established law in this state that an insolvent debtor may prefer one or more of his creditors even if it exhausts the whole of his property to do so. *McAvoy v. Jennings*, 44 Wash. 79, 87 Pac. 53; *Vietor v. Glover*, 17 Wash. 37, 48 Pac. 788, 40 L. R. A. 297; *Troy v. Morse*, 22 Wash. 280, 60 Pac. 648; *West Coast Grocery Co. v. Stinson*, 13 Wash. 255, 43 Pac. 35. But it must be done in good faith. The debt paid must be real, the payment actual, the consideration adequate. It must not be designed to prevent other creditors ever being paid. The preferred debt must not be used as a colorable consideration to protect the debtor's property from other claims or to delay or hinder their enforcement. The transfer must not be tainted with any secret

trust for the debtor.   Bump, Fraudulent Conveyances (4th ed.), §§ 172, 173, 174.

As to notice of what facts will vitiate a conveyance, there is a real distinction between a purchaser for a cash consideration paid at the time of conveyance, and a purchaser in consideration of the satisfaction of an antecedent debt.   Notice of the debtor's insolvency and of his intention to prefer, and that it may actually defeat the collection of other debts, or even notice of an intent to defeat an execution, will not injuriously affect the preferred creditor.   He is not a volunteer.   He is protecting himself and has a right to the reward of his diligence.   It obviously requires much stronger proof to charge a preferred creditor with fraud than would be required in the case of a mere volunteer.   The proof must show an active, rather than the merely passive, participation in the debtor's fraudulent design, which would be sufficient in case of a volunteer.

"A preference may be given and received for the express purpose of defeating an execution, for the mere intent to defeat an execution does not of itself constitute fraud.   The payment of a just debt is what the laws admits to be rightful, and is not, therefore, fraudulent, either in law or in fact.   The preferred creditor cannot be affected injuriously with notice of the debtor's intent to prefer, and thereby defeat an execution, because the purpose is honest, and such as the law sanctions.   This is not delaying or hindering within the meaning of the statute.   It does not deprive other creditors of any legal right, for they have no right to a priority.   One creditor of a failing debtor is not, under the statute, bound to take care of the others.   In such case, if the assets are not sufficient to pay all, somebody must suffer.   It is a race in which it is impossible for every one to be foremost.   He who has the advantage, whether he gets it by the preference of the debtor or by his own superior vigilance, or by both causes combined, is entitled, under the statute, to what he wins, provided he takes no more than his honest due.   He is not obliged to look out for other creditors, or to consider whether they will or will not get their debts.   He does not violate any principle of the statute when he takes payment

or security for his demand, though others are thereby deprived of all means of obtaining satisfaction of their own equally meritorious claims, and though he may be aware of the intent of the debtor to defeat the collection of them. Fraud, in its legal sense, cannot be predicated of such a transaction. Wherever there is a true debt, and a real transfer for an adequate consideration, there is no collusion." Bump, Fraudulent Conveyances (4th ed.), § 170.

We are convinced from the evidence that Udd knew more concerning Bonn's affairs than he was willing to admit. He protests too much. If he were a mere volunteer we would be strongly inclined to hold the conveyance fraudulent, but we cannot say that he, as a preferred creditor, was shown to have had such notice or to have so participated in Bonn's fraud as to cause him to lose the preference. The burden of proof rested upon the appellant to impeach the preference, and in such a case the fraudulent intent on the part of the preferred creditor must be clearly shown. Bump, Fraudulent Conveyances, § 177.

It may be suggested that Udd was not a creditor to the whole extent of the purchase price, because he paid $700 in excess of his claim. It sufficiently appears, however, that this was necessary in order to secure any payment of his debt. Bonn refused to convey to him without the added payment. The mere fact of the payment of an excess in pursuance of the lawful purpose of procuring payment of an actual debt will not vitiate the transaction. Bump, Fraudulent Conveyances, § 178.

The appellant's motion for a new trial was based mainly upon a claim of newly discovered evidence. Bonn had testified that, out of the $700 which he received from Udd, he paid a $300 note held by the Scandinavian American Bank of Tacoma against him. Udd at first testified that he paid Bonn the $700 in cash a few days prior to the execution of the deed; that he drew the money out of the Dexter Horton & Company Bank of Seattle for that purpose; and that he had $900 on deposit in that bank. On cross-examination he modified

this, stating that he did not pay this money by check, but that he had money in safe deposit and also some in his pocket from which he paid Bonn. The affidavit in support of the motion for a new trial states that, subsequent to the decision of the trial court, plaintiff's attorney had ascertained that the $300 note due to the Scandinavian American Bank by Bonn was paid on January 18, 1910, more than four months prior to the alleged payment of the $700 to him by Udd. Also that the records of Dexter Horton & Company show that Udd opened an account with that bank in September, 1909, by depositing the sum of $800; that he withdrew from that deposit the sum of $100 in December, 1909; that in January, 1910, he withdrew $307, and in February the balance of $400 and closed his account. This evidence could not have changed the result. Bonn's fraudulent intent was already sufficiently established, and the offered evidence as to the payment of the $300 note was only pertinent to that point. While the new evidence as to Udd's deposit with Dexter Horton & Company would show that Udd did not pay Bonn the $700 by check on that bank, a statement which Udd himself had modified, it would also have some tendency to show that Udd had the means to pay the $700 at about the time he says he paid it. The motion for new trial was properly denied.

Judgment affirmed.

DUNBAR, C. J., CROW, MORRIS, and CHADWICK, JJ., concur.