[No. 26442.   Department One.   April 9, 1937.]

ANNA F. CURTISS, *Individually and as Administratrix, Respondent,* v. C. E. CROOKS, *as Trustee in Bankruptcy, Appellant.*[1]

*McEwen & Brooks,* for appellant.

*E. C. Ward, Thurman E. Ward, F. A. Smith,* and *John M. Stapleton,* for respondent.

[1]Reported in 66 P. (2d) 1140.

MILLARD, J.—On September 1, 1931, Frederick George Smith executed and delivered to the First National Bank of The Dalles, Oregon, his note for $22,066.35, representing the personal obligation of Smith and the community obligation of Smith and his wife to that bank. On October 31, 1932, the bank commenced an action in the superior court for Klickitat county against the Smiths on the above described note. On November 9, 1933, judgment was entered in favor of the bank and against the Smiths for the balance due on the note.

By deed executed November 4, 1932, which was four days subsequent to the commencement of the action by the bank against the Smiths, the Smiths executed a deed conveying eight thousand acres of land, owned by them in Klickitat county from 1918 until the date of the execution of this deed, to Leon W. Curtiss. It appears that, at this time, Curtiss held a note of the Smiths in the amount of thirty thousand dollars, on which there was an unpaid balance of $11,800. There is some contention that, on the date of the execution of the deed, the land in question, which was the only real property owned by the Smith marital community, was of the value of approximately forty thousand dollars. This deed was duly placed of record in the office of the county auditor.

On April 20, 1932, the Smith marital community became further indebted to the First National Bank of The Dalles. This indebtedness was secured by a chattel mortgage on personal property then owned by Smith. That mortgaged property was sold under decree of foreclosure and applied to the payment of the note. A deficiency judgment was entered in the sum of $8,154.67, which has never been paid.

On March 20, 1934, Smith, individually, and Smith and his wife, as a marital community, were adjudicated

bankrupts in the district court of the United States for the eastern district of Washington, southern division, upon their voluntary petitions. At the first meeting of the creditors of the bankrupts, C. E. Crooks was elected trustee for the bankrupts. The First National Bank of The Dalles filed its claims, which were in excess of thirty-two thousand dollars, against the bankrupts.

On April 13, 1934, which was almost a month subsequent to the date the Smiths were adjudicated bankrupts, Leon W. Curtiss and his wife instituted an action in the superior court for Klickitat county against C. E. Crooks, as trustee in bankruptcy for Smith, individually, and the Smith marital community, for the purpose of quieting title to the real property described in the deed of November 4, 1932, from the Smiths to Curtiss. The defendant trustee, by answer and cross-complaint, prayed that the deed be set aside as fraudulent, and that the title to the real property described in the deed be quieted in the trustee in bankruptcy.

The trial court's findings in that action are summarized as follows: At the time of the execution and delivery of the deed in question, and for a considerable time prior thereto, Leon W. Curtiss and wife possessed knowledge of convincing facts sufficient to cause them to believe that the Smiths were then insolvent and unable to pay their then existing debts as they matured. The Smiths, desirous of placing their property beyond the reach of their creditors, conceived the fraudulent plan of conveying to Leon W. Curtiss and wife, as preferred creditors, the lands in question. As a consideration therefor, Curtiss was to cancel and deliver to Smith his thirty thousand dollar note, on which there was then owing and unpaid $11,800, and also deliver another note, in excess of eighty-three thousand dollars, and a mortgage given by the maker of

that note to secure the payment thereof, which was then held by Curtiss as collateral security for the balance then unpaid on Smith's note in the amount of thirty thousand dollars. The Smiths made known to Curtiss their proposed plan of disposing of their property and their selection of Curtiss as a secured creditor.

While the finding is to the effect that the Smiths conceived the fraudulent plan, and that Curtiss and wife possessed knowledge sufficient to cause each of them to believe that the Smiths were then insolvent, there is no finding that Curtiss entered into any agreement to defraud the other creditors.

The court concluded that the deed should be set aside and title to the real property quieted in the trustee as against Curtiss and wife, and all persons claiming under, by or through them, subject, however, to a prior preferred lien in favor of Curtiss and wife on the real property in question in the amount of twelve thousand dollars, with interest thereon at the rate of six per cent per annum from November 4, 1932,

" . . . which lien shall be foreclosable in any proper action, but subject to any defense arising subsequent to said 4th day of November, 1932."

Decree, accordingly, was entered.

On December 11, 1933, Curtiss and wife entered into a contract with L. A. Duncan, under the terms of which Curtiss and wife, as vendors, agreed to sell to Duncan, as vendee, approximately eight hundred and fifty acres of the tract of eight thousand acres conveyed by the deed of Smith to Curtiss. The title to the tract of eight thousand acres was quieted in the trustee in bankruptcy by the decree entered April 19, 1935. Duncan testified that the contract was not one of sale and purchase, but was an arrangement out of which he conveyed his land to Curtiss and took back this pur-

ported contract of purchase for the purpose of securing Curtiss for a preexisting debt.

Subsequent to receipt of deed from Smith, the Curtiss marital community sold for $740 a right of way to the state of Washington across a portion of the lands not involved in the Duncan contract. Curtiss and wife went into possession of the eight thousand acres conveyed to them immediately upon receipt of the deed from Smith on November 4, 1932, and continued in possession thereof, and used the same for their own use and benefit, until the entry of the decree in the case Curtiss v. The Trustee in Bankruptcy, in which the title to the land was quieted in the trustee in bankruptcy and Curtiss and wife awarded a prior lien in the amount of twelve thousand dollars against the property in question. Subsequent to that action, Leon W. Curtiss died intestate, and his wife was appointed administratrix of his estate.

On April 19, 1935, Anna F. Curtiss, individually, and as administratrix of the estate of her deceased husband, instituted an action to foreclose the lien of twelve thousand dollars, preserved to the Curtiss marital community when the Smith deed to them was set aside, as recited above. The trustee in bankruptcy answered, admitting the entry of the decree setting aside the Smith deed to Curtiss and the award of the lien of twelve thousand dollars to the Curtiss marital community.

Defendant trustee sought, by way of counterclaim, $740 received by Curtiss for the sale of the right of way over the land; the reasonable value of the use and occupation of the land from November 4, 1932, the date of the conveyance from Smith to Curtiss, to March 15, 1935, the date of the decree quieting title to the eight thousand acres in defendant trustee; that plaintiffs be required to accept from defendant a deed

for the land contracted by Curtiss to be sold to Duncan and credit plaintiffs' lien on the property with the purchase price stated in said contract, in the amount of $7,770. The aggregate amount of the counterclaim exceeded the amount of plaintiffs' lien on the real property in the amount of $322.60, in which amount the defendant prayed judgment against the plaintiffs and that the lien established by the decree in the action setting aside the deed be satisfied and discharged.

By reply to the counterclaim praying that plaintiffs be required to accept title to the land contracted by Curtiss to be sold to Duncan, plaintiffs affirmatively pleaded that the land covered by the contract was owned by Duncan, and that the contract between Curtiss and Duncan was, in fact, a mortgage given to secure a preexisting debt owed by Duncan to Curtiss at the date the contract was executed.

Defendant's demurrer to the affirmative allegations of the reply, on the ground that the allegations constituted a departure from the allegations of the complaint, and that the question of ownership and title of the real property in question was adjudicated by the decree in the action of Curtiss to quiet title to the property, was overruled.

Trial of the cause to the court resulted in a decree for the sale of all of the property described in the deed from Smith to Curtiss (this includes the Duncan contract land) to be sold to satisfy plaintiffs' lien of twelve thousand dollars, with interest from November 4, 1932, at six per cent per annum, after deduction of the money received from the sale of the right of way and the costs awarded the defendant in the other action and the reasonable value of the use and occupation of the property from March 20, 1934 (the date of the adjudication of the bankruptcy of the Smiths), to March 15, 1935 (the date of the entry of the decree

setting aside the deed from Smith to Curtiss), in the sum of nineteen hundred dollars. Defendant was denied credit for the reasonable value of the use and occupation of the real property from November 4, 1932 (the date that Curtiss took possession of the land under the deed from Smith), to March 20, 1934 (the date of the adjudication of the bankruptcy of the Smiths). Defendant's prayer that the plaintiffs be required to accept the deed tendered by defendant to the land covered by the Duncan contract, and that the contract price thereof be credited on plaintiffs' lien on this real property, was denied.

In satisfaction of that judgment and pursuant to order of sale, the property was sold by the sheriff of Klickitat county, plaintiffs being the purchasers of that property, for the full amount of the judgment, interest, and costs to date of sale. The defendant has appealed.

Counsel for appellant contend that the affirmative allegations of respondents in their reply, that the Duncan contract was not one of purchase and sale, but was an arrangement to secure the Duncan indebtedness due to Curtiss, constitutes a departure from the respondents' complaint, as in the complaint there is set up the decree quieting the title to all this property in the trustee in bankruptcy and awarding to the respondents a lien on this property on account of the deed being set aside.

Counsel cite Rem. Rev. Stat., § 277 [P. C. § 8363], which reads as follows:

"When the answer contains new matter constituting a defense or counterclaim, the plaintiff may reply to such new matter, denying generally or specifically each allegation controverted by him, or any knowledge or information thereof sufficient to form a belief; and he may allege in ordinary and concise language, without repetition, any new matter not inconsistent with the complaint, constituting a defense to such new matter in the answer."

and insist that the affirmative allegations in the reply, that the title to the tract of land (which the trustee, in his answer, alleged Curtiss and wife sold to Duncan under contract and which was a portion of the land title to all of which was quieted in appellant trustee in the action brought by Curtiss and wife to quiet title in them), was, in fact, in Duncan, and not in appellant, is at complete variance with the allegations of the complaint in the present action and the decree of the former action set forth therein; therefore, the demurrer to the reply should have been sustained, and appellant's objections to the introduction of testimony in support of the affirmative allegations of the complaint should have been sustained.

Inasmuch as the respondents did not, by their reply, seek recovery on grounds different from the cause of action alleged in the complaint, there was not a departure. The purpose of respondents in bringing this action was to foreclose a lien awarded to them by the decree in the former action. Appellant, by answer, sought an offset to the amount claimed by the respondents under the decree.

On the issue made by the respondents' reply to appellant's answer, the question presented is whether Curtiss had received any payment on the Smiths' indebtedness to Curtiss and wife, in payment of which indebtedness the Smiths executed the deed to the Curtiss marital community. In the former action (that of Curtiss and wife against the trustee in bankruptcy to quiet title to the land conveyed to them by the Smiths), there was a determination of the title to, and right of possession of, the eight thousand acres of land under the deed from the Smiths to Curtiss and wife, as between Curtiss and the trustee in bankruptcy for the Smiths. In that action, it was also determined that Curtiss had a prior preferred lien in the

amount of twelve thousand dollars on the land described in the deed from the Smiths to Curtiss and wife,

" . . . which lien shall be foreclosable in any proper action, but subject to any defense arising subsequent to said 4th day of November, 1932."

The final net amount due respondents under the lien awarded to them was not determined in the former action. That question was reserved for future litigation; hence, the decree in that action constitutes no bar to the present action to determine, and enforce collection thereof by foreclosure of their lien, the final net amount due the respondents.

"A judgment or decree which expressly excepts or reserves from its operation specified rights or claims of the parties in suit, or the decision of questions in issue, or the right to take further proceedings in respect to certain matters, is not a bar to a subsequent action on the matters so reserved; but on the contrary the reservation itself becomes res judicata, and prevents the raising of any question as to the right to bring or maintain such subsequent suit." 34 C. J. 797, § 1217.

Counsel for appellant next urged the defense of *res adjudicata,* contending that the question of the title to all of the land involved in this litigation was adjudicated in the former action when the title to the land was quieted in appellant as trustee in bankruptcy of the Smiths. It is urged that, as in the former action appellant was adjudged to be the owner of all the real property in this action, respondents were thereby precluded from again raising that question in the case at bar. Therefore, it is argued, appellant's objection to the introduction of testimony in support of the affirmative allegations (status of the Duncan land contract) of the reply should have been sustained.

The question in the action of the respondents to quiet title was whether the deed from the Smiths to

them was fraudulent and should be set aside. No other question, as we read the record, was considered or decided. If the question of offset to the respondents' lien had been litigated in the former action, the status of the Duncan contract would also have been admissible as a defense to such offset. The court could then have determined the character of the transfer between Smith and Curtiss, and between the trustee and Curtiss, as to the fraudulent character of the deed as against Smith's creditors, and at the same time could have determined and given effect to the status of the Duncan contract.

The question of offset of the Duncan contract to respondents' lien was not litigated in the former action. As stated above, that question was reserved for future litigation.

"It is said in 23 Cyc. 1145: · 'Where a judgment or decree expressly excepts or reserves from its operation specified rights or claims of the parties in suit, or the decision of questions in issue, or the right to take further proceedings in respect to certain matters, it constitutes no bar to a subsequent action on the matters so reserved; but on the contrary the reservation itself becomes res judicata, and prevents the raising of any question as to the right to bring or maintain such subsequent suit.' In *Bodkin v. Arnold,* 45 W. Va. 90, 30 S. E. 154, the first headnote says: 'When a decree is entered reserving the right to any party to further litigate any matter in controversy in the suit, such reservation may be reviewed on appeal by any party prejudiced thereby, and, if no appeal is taken, such reservation becomes res adjudicata, and cannot be called in question by any party in any other suit or proceeding.' . . . The particular right or cause of action named therein being preserved by the former decree, it necessarily follows that the plaintiff's right to prove his cause of action by any competent evidence is also preserved, even though the evidence necessary to prove it be identical with that in the former action." *Hardin v. Hardin,* 26 S. D. 601, 129 N. W. 108.

■ The doctrine of *res adjudicata* was first definitely formulated in the *Duchess of Kingston's* case, and, as stated in 34 C. J. 743, embodies two main rules which are stated as follows:

"The judgment or decree of a court of competent jurisdiction upon the merits concludes the parties and privies to the litigation and constitutes a bar to a new action or suit involving the same cause of action either before the same or any other tribunal."

"Any right, fact, or matter in issue, and directly adjudicated upon, or necessarily involved in, the determination of an action before a competent court in which a judgment or decree is rendered upon the merits is conclusively settled by the judgment therein and cannot again be litigated between the parties and privies whether the claim or demand, purpose, or subject matter of the two suits is the same or not."

The first of those two main rules is not applicable in the case at bar, as there is no identity of causes of action. The former action was brought by respondents to quiet title to a tract of land. The case at bar was brought by respondents to foreclose the lien awarded by the decree in the former cause. The present cause of action—foreclosure of the lien—did not exist until the decree was rendered in the former suit. Neither is there any identity between the former cause of action and the allegations in respondents' reply in the case at bar, to the effect that the Duncan contract was not a contract of sale and purchase.

"Test of Identity of Cause of Action.—If it is doubtful whether a second suit is for the same cause of action as the first, it has been said to be a proper test to consider whether the same evidence would sustain both. If the same evidence would sustain both, the two actions are considered the same, and the judgment in the former is a bar to the subsequent action, although the two actions are different in form. If, however, different proofs would be required to sustain the

two actions, a judgment in one is no bar to the other. It has been said that this method is the best and most accurate test as to whether a former judgment is a bar in subsequent proceedings between the same parties, and it has even been designated as infallible. Sometimes the rule is stated in the form that the test of the identity of causes of action for the purpose of determining the question of res judicata is the identity of the facts essential to their maintenance." 15 R. C. L. 964, § 439.

"In *Buddress v. Schafer, supra* [12 Wash. 310, 41 Pac. 43], it is said:

" 'To determine whether a former judgment is a bar to a subsequent action, it is necessary to inquire whether the same evidence would have maintained both of such actions.'

"It is unnecessary to multiply authorities. This principle is laid down by every text writer and sustained by all authority. It is the primary test of *res judicata.*" *Mallory v. Olympia,* 83 Wash. 499, 145 Pac. 627.

"When the judgment of a court is expressly limited and expressly reserves some phase of the controversy for future litigation, that reservation can hardly be called mere *dictum.* . . . Manifestly, it would require different evidence to establish the reasonable value of the services from that which was required and was offered to prove the specific contract with Mary Jeffs and to establish a recovery on it as an express contract. We have held, by decisions both early and late, that a judgment in a suit on an express contract is not a bar to a second suit on a *quantum meruit* where it takes different evidence to establish the two causes of action. [Citing cases.]" *Hart v. Bogle,* 88 Wash. 125, 152 Pac. 1010.

It is unnecessary to discuss at length the second of the two main rules embodied in the doctrine of *res adjudicata.* The second rule, like the first, is not applicable in the case at bar. Was the "right, fact or matter in issue, and directly adjudicated upon, or

necessarily involved in, the determination" of the former action? What we have heretofore said answers that question in the negative. The case at bar is upon a cause of action different than the former action. The judgment in the former action concludes only those matters that were in issue, actually litigated in, or necessarily involved in, the determination of the former action.

The trial court did not err in overruling the objections of appellant to the testimony that the contract between Duncan and Curtiss and wife was not one of sale and purchase, but was an arrangement under which Duncan conveyed *his* land to Curtiss and then took back this apparent contract of purchase for the purpose of giving to Curtiss and wife security for a preexisting indebtedness of Duncan to them. The contract price of $7,770 was never received by the respondents. Though it extends this opinion, we quote as follows from appellant's abstract of record in order that the transaction may be understood:

"L. A. DUNCAN, a witness recalled by the plaintiff, testified in substance and intent as follows:

" (Plaintiffs' Exhibit 2, the Duncan contract, was received in evidence for convenience.)

"This is a contract entered into between the Curtiss' and myself on December 11th, 1933, and covers 892 acres of land.

"  . . . . . . . . . . . . . .

" 'This whole thing was based upon that former contract; September 8, 1925. I entered into a contract with Fred G. Smith to purchase some 1591 acres. That contract called for certain payments which were made along at the times specified in the contract, for some years. And that contract also called for delivery of a deed to certain portions of that land upon certain payments, and, on October 8, 1930, a deed was made to Mr. Curtiss. It was from Fred Smith and wife and L. A. Duncan and wife to Mr. Curtiss. That deed was given to Mr. Curtiss in the nature of a trust deed to

secure the payment of $17,755.00, which was the out-growth of a deal between Mr. Curtiss and I, whereby he loaned me $10,000.00 with which to put in certain pumping plant and so forth down there, and also $5,000.00 with which to pay Mr. Smith for a part of the lands covered by the original contract, dated September 8, 1925, and also to pay for some forty odd acres which I purchased from Mr. Curtiss at that time. So that the $17,000.00 covered—$17,755.00—covered three items: One was the loan of $10,000.00; the other the loan of $5,000.00, and the other the purchase price of some forty-three acres of land. Then Mr. Curtiss, in turn, gave me back the contract of purchase of that same land on conditions that I pay for it as it was conveyed to me. Now, I went along and I made the sale of the property and turned the mortgages to Mr. Curtiss at the various times until I had reduced that indebtedness to $7,770.00. In the meantime, Mr. Curtiss had deeded all of that platted area—I will say all of that four hundred acres with the exception of thirty-three acres in section 33. I just simply had it as an open account against me for the balance that I owed him'—which was $17,755.00 at the time he gave me a deed and was afterwards reduced to $7,770.00.

"Then it came to the time when—when this five thousand dollars was paid to Smith and I got a deed to this four hundred acres. I paid three hundred and some dollars in addition to the five thousand, which reduced the balance on the original contract to eight thousand six hundred dollars. That payment constituted—That payment covered everything that was due up to that date. Then it run along and there come a time when the balance of eight thousand six hundred dollars come due. There was a clause in that contract that provided that Smith was to pay me one thousand dollars a year rental for the property during the life of that contract. That interest—or that rental partially offset the interest, and there come a time when it more than offset the interest, and, as I say, it all come due and I went to Fred and I said I realize that this—

"Anyway, it run along a while. Along in the late summer of 1933 it came to my knowledge that Mr.

Smith had deeded this property that I held under contract to Mr. Curtiss some several months prior to the time that I learned of it. As soon as I learned that, very soon after I learned that, I went to Mr. Curtiss and spoke to him about it, and he said, yes, of course, I realize it is subject to your contract. Then I begin to get busy to fulfill my contract, and I negotiated a deal with Mr. Curtiss whereby he agreed to loan me the eight thousand six hundred dollars in addition to the seven thousand seven hundred and seventy dollars that he already paid me—that I already owed him, making something like sixteen thousand dollars altogether. The agreement was that he was advancing this money then I would give him title to the twelve hundred odd acres as security for both items. Then I went to Mr. Smith and told him I was ready to pay him and wanted a deed to the property. Then he said there is a part of that land I can't deed to you, there is three hundred and twenty acres in section twenty-two that I cannot deed to you, because I have not title to it. He said my mother has title to that. In the meantime I had checked the records and found that that was true. Well, I says, what are you going to do about it? He said the only thing I can see I will buy it back from you. Of course we were unable to agree on what it was worth, but we finally settled it by me releasing that.

"That he could not give title to, three hundred and twenty acres, in full payment of the balance due, eight thousand six hundred dollars. That left it down to eight hundred odd acres which he had already deeded to Mr. Curtiss. Then, as I thought, to clear the title in Mr. Curtiss, I quitclaimed to Mr. Curtiss and took a contract of purchase back, or rather, in that way, used that to secure the seven thousand seven hundred and seventy dollars I owed Mr. Curtiss.

"In 1933, I had paid all that was due on the original contract except $8600.00, and we finally agreed that the value of the 320 acres was equivalent to that balance, and I surrendered that in payment and figured that, in 1933, I had fully paid Smith and was entitled to a deed. The deed that Smith made to Curtiss I did not recognize.

"Upon cross-examination, he testified in substance and intent as follows:

"In my opinion, the value of the land covered by my contract with Curtiss is about $50.00 an acre, and I would hate to take $40,000.00 for it. I did not know anything about this deed from Smith to Curtiss when it was delivered. When I discovered it, as soon as convenient, I went to Curtiss for an explanation and also to Smith, and we started negotiations with the final result that I released 320 acres and was cleared up on the other and got a contract back. I never did have a deed to this property.

"Q. Why didn't you intervene in this case instead of filing a claim in the Curtiss estate as a purchaser for this property?

"A. That has been a debatable question in my mind right along. Considering all the circumstances, I did not do it.

"Q. In the Curtiss estate you are taking the stand that you were the purchaser; isn't that your claim, that you filed, that you were a purchaser under this contract, you did not claim title, did you?

"A. Well, I am not a lawyer and I simply followed the advice of a lawyer in the matter.

"Q. Then you knew that this case was pending for a long time?

"A. That is true.

"Q. Instead of intervening in this case to protect your title, you have filed a claim against the Curtiss estate as a purchaser under contract, haven't you?

"A. The record speaks for itself, I think.

"FRED G. SMITH, recalled as a witness for Plaintiff, testified in substance and intent as follows:

"I heard Mr. Duncan's testimony, and have personal knowledge of the circumstances.

"(Thereupon follows Mr. Smith's statement of the deal with Duncan, which is substantially as set forth in Mr. Duncan's testimony, his statements being found in the statement on pages 337, 338 and 339.)

"*Mr. Curtiss asked me to deed this property to him as part of the adjustment, and I told him at that time that Duncan had that land and he was entitled to a deed, and he said he would take it and then settle with*

*Mr. Duncan.* The land that I could not give title to was in sections 22 and 23 in the map colored yellow. I did not own it and never did own it. Mr. Duncan had made settlement of the land involved, by which I gave Curtiss a deed, but releasing me on the other part of the contract."

██ It is next urged that appellant is entitled to a credit on respondents' lien on the real property in controversy for the reasonable value of the use and occupation of the property by respondents from November 4, 1932, the date of the Smith deed to Curtiss, to March 20, 1934, the date the Smiths were adjudged bankrupts. The appellant was given credit on the respondents' lien for the reasonable rental value of the land from March 20, 1934, when the Smiths were adjudged bankrupts, to March 15, 1935, when respondents surrendered possession of the land to appellant.

We note the argument of appellant that respondents were guilty of actual fraud in taking the deed from the Smiths, and that the respondents should not be permitted to profit by their fraudulent transaction.

While, in the former action, the court found that the Smiths conceived the fraudulent plan, and that Curtiss and wife were charged with knowledge of the Smiths' insolvency, there is no finding that Curtiss and wife entered into any agreement to defraud anyone. The respondents were made preferred creditors. The Smiths had the legal right to so prefer them. In the former action, the trial court recognized that right. It is true that the deed was set aside and title to the real property was quieted in the trustee in bankruptcy. However, that was made subject, by the court's decree, to prior preferred lien in favor of the respondents. As stated above, Curtiss was a creditor of Smith, and he secured, as the law permitted him to do, a preference. *National Surety Co. v. Udd,* 65 Wash. 471, 118 Pac. 347; *Allen v. Kane,* 79 Wash. 248, 140 Pac. 534.

It should be borne in mind that for almost two years no steps were taken to impeach the conveyance. If the conveyance had not been made, it could hardly be successfully contended that, if any rents and profits were taken by the owner-debtor during that time, the owner-debtor could not have disposed of such rents and profits as he saw fit.

"Assuming that they were fraudulent grantees of the oral lease, they had the right, as against their assignor, to plant the same and grow crops thereon which the creditors of the fraudulent grantor could not reach. In 20 Cyc., at page 368, the rule with this respect is stated:

" 'But if a fraudulent grantee enters into possession and cultivates the land upon his own account, the grantor's creditors cannot reach and subject the annual crops. They can only attach and levy upon what their debtor owned and fraudulently conveyed. The same is true of other property produced by the grantee.' " *Smith v. Dement Brothers Co.*, 100 Wash. 139, 170 Pac. 555.

In *Tate v. Sanders*, 245 Mo. 186, 149 S. W. 485, Ann. Cas. 1914A, 998, it was held that, where an alleged fraudulent grantee, taking without any secret trust, claims against both the creditor and the debtor, his liability for rents and profits accrues only from such time as the debtor himself would have been liable had the property remained in the debtor's hands.

In *Tate v. Sanders, supra,* attention is directed to the fact that a number of cases cited by the author of Bump on Fraudulent Conveyances, to sustain a position contrary to the rule announced by this court, actually held that the grantee is liable for rents only from the date of the sheriff's deed. The court said:

"The main cause of all the disagreement on this question is Sec. 626 of Bump on Fraudulent Conveyances, which is as follows: 'It certainly is not consonant with the principles of the law that the grantee

should derive any advantage from his fraud. Consequently, he may be compelled to account for the profits from the time of the transfer. An account may also be taken of what has been received as compensation for the use of the property. The grantee should not be charged with the increased rent and profits arising from improvements made by him.'

"Then follows a long list of citations, many of which are in direct opposition to the text, and a majority of which are cases of 'secret trusts,' while others were cases where the property had passed into the hands of administrators, trustees in bankruptcy or other fiduciaries. The leading case relied on by Bump is *Loos v. Wilkinson*, 110 N. Y. 95. It must be frankly admitted that the language of the opinion in that case is strongly in favor of the right of the creditor to rents. But an examination of that case shows that the transfer was made under a secret trust for the benefit of the debtor. Under the rules above stated by us the grantee was liable because of the fact that he was such trustee. . . .

"Not one of the cases cited by that work on Fraudulent Conveyances holds the grantee liable for rents where there was no secret trust and where the property was subject to execution."

In some jurisdictions, a fraudulent conveyance is held to be void. In this state, it is voidable only; therefore, until the conveyance is impeached, the grantee is entitled to the rents and profits.

"The creditors cannot take both the property and the consideration therefor; nor, in those jurisdictions in which the conveyance is voidable only, can they subject the property in the grantee's hands, until the fraud is exposed, and the transfer set aside in some judicial proceeding, . . ." 27 C. J. 666.

The judgment is affirmed.

STEINERT, C. J., MAIN, BLAKE, and GERAGHTY, JJ., concur.