**WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Plaintiff–Appellant,**

v.

**PITTSBURGH–DES MOINES CORPORATION, a Pennsylvania corporation; and The American Insurance Company, a New Jersey corporation, Defendants–Appellees.**

**PITTSBURGH–DES MOINES CORPORATION, a Pennsylvania corporation, Plaintiff–Appellant,**

v.

**WASHINGTON PUBLIC POWER SUPPLY SYSTEM, a Washington municipal corporation; Vera Claussen; Kenneth Cochrant; Raymond Colbert; Cornelius Duffie; Sam Farmer; Carl Halvorson; Parker Knight; Paul Nolan; Lois Powell; Sydney Steinborn; Louis Winnard; James Perko; Richard Breshnahan, Defendants–Appellees.**

Nos. 86–4300, 88–3554.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 15, 1988.

Memorandum March 29, 1989.

Order and Opinion May 23, 1989.

William J. Bender and Linda J. Strout, Seattle, Wash., for plaintiff-appellant, WPPSS.

Stanley J. Bensussen, Richland, Wash., for cross-appellant, WPPSS.

Hobart A. McWhorter, Jr., Birmingham, Ala., for defendant-appellee, Pittsburgh–Des Moines Corp.

Before WRIGHT, WALLACE and HUG, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge.

This case stems from litigation of issues arising from contractual agreements between Washington Public Power Supply System (WPPSS) and Pittsburgh–Des Moines Corporation (PDM) relating to the construction of WPPSS Nuclear Project No. 2 (WNP–2) and Project No. 5 (WNP–5).

In WPPSS's appeal (*PDM I*), we examine several contracts involving the retrofit of WNP–2 to determine the scope of WPPSS's breach of contract and warranty actions against PDM. In PDM's cross-appeal (*PDM–II*), we decide whether PDM must seek satisfaction of a judgment relating to the construction of WNP–5 only from the WNP–4/5 Construction and Revenue Funds.

## I. PDM–I: WPPSS's APPEAL

### Background [1]

In 1972 PDM entered into Contract 213 with WPPSS and agreed to construct the nuclear containment vessel at WNP–2. Both parties fulfilled their contractual obligations satisfactorily. WPPSS determined later that new federal design requirements necessitated reinforcement and modification of the containment vessel. In 1977 PDM entered into Contract 213A in which it agreed to "retrofit" the WNP–2 steel structures.

Problems arose under Contract 213A. In 1981 the parties became dissatisfied with its payment provisions. They modified 213A and replaced it with Modification (Mod.) 164 and Contract 213B. Mod. 164, which bridged the two contracts, provided for a $50 million settlement for completed contract work up to and including February 28, 1981, but saved claims for certain "defective or nonconforming" work. In 1982 PDM completed the retrofit under 213B, and WNP–2 is now operational.

Because the parties could not resolve what claims were saved under Mod. 164, WPPSS sued PDM for damages arising from the alleged collapse of PDM's quality assurance program. In response, PDM asserted numerous defenses and two counterclaims. *PDM I* is a contract dispute involving the interpretation of the WNP–2 agreements to determine what terms govern WPPSS's breach of contract and warranty claims.

### Analysis

#### A. Claims for Breach of Contract and Warranty

Following massive discovery, the parties filed cross-motions for summary judgment. In a lengthy memorandum and order the court ruled (1) that Mod. 164, as a matter of law, unambiguously extinguished all WPPSS's claims under Contract 213A except those sounding in warranty; (2) that Mod. 164 is ambiguous as to whether Contract 213A or 213B warranties govern the reserved claims; and (3) that Contract 213A warranties are ambiguous as to whether they attached before *or* after completion and turnover of PDM's contract work.[2] WPPSS contends that the court erred in its three summary judgment rulings.

Examining the WNP–2 contracts, we must determine initially whether certain contractual language is ambiguous.[3] Whether a contract is ambiguous is a question of law for the court. *Vanderpool v. Grange Ins. Ass'n*, 110 Wash.2d 483, 756 P.2d 111, 114 (1988). We review *de novo* the court's grant of summary judgment and its interpretation of state law. *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 852 (9th Cir.1988); *In re McLinn*, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).

Under Washington law, ambiguities exist when contract terms are uncertain or capable of being understood in more than one manner. *E.g., McGary v. Westlake Investors*, 99 Wash.2d 280, 661 P.2d 971, 974 (1983). "The controlling intent of the parties must be ascertained from reading the contract as a whole, and where the language used is unambiguous, no ambiguity will be read into the contract." *Taylor–Edwards Warehouse & Transfer Co. v. Burlington N., Inc.*, 715 F.2d 1330, 1334 (9th Cir.1983) (applying Washington law); *see St. Yves v. Mid State Bank*, 111 Wash. 2d 374, 757 P.2d 1384, 1386–87 (1988) (holding that parol evidence not admissible to create an ambiguity).

#### 1. Reservation of Breach of Contract, Warranty Claims

In Mod. 164 the parties settled all claims arising from the performance of

---

**1.** We adopt the district court's findings of fact, which the record supports. *See* Memorandum and Order at 4–31 (Jan. 24, 1986) [hereinafter Summary Judgment Order]. We provide here only a general background of the circumstances surrounding *PDM I*.

**2.** The trial court certified its summary judgment rulings and urged this court to review them "in light of the fact that these conclusions will govern a jury trial estimated to last many months." A motions panel, however, denied WPPSS's petition for interlocutory review. *See* Order (No. 86–8084) (May 29, 1986).

**3.** Washington law governs the interpretation of the WNP–2 contracts.

Contract 213A *except* those "related to defective or nonconforming work accomplished prior to February 28, 1981" that may arise from PDM's failure to implement its quality assurance program properly.

WPPSS contends that the exclusion clause in Mod. 164 saved all breach of warranty *and* contract claims arising from the breakdown of PDM's quality assurance program.[4] PDM asserts that WPPSS failed to preserve *any* breach of contract claims.

The crux of the contractual dispute focuses on ¶ 2 of Mod. 164, which reads in its entirety:

> [Modification 164]
>
> Provides for settlement and compensation for all completed contract work in place, approved and accepted by the Owner up to and including February 28, 1981 on the basis of a negotiated cost incurred of $50,329,631. Payment is in consideration of *settlement and full and final compromise of all* outstanding unexecuted change orders, claims, materials on site (not installed) purchased by the Contractor, all escalation, causes of action and damages arising out of or in connection with said performance of the 2808–213A Contract up to and including February 28, 1981, *excluding any issues* between Owner and Contractor *related to defective or nonconforming work* accomplished prior to February 28, 1981 and [sic] that may arise from contractors failure to properly implement the Quality Assurance Program as set forth in the 2808–213A by reference herein as applicable to this issue.

(emphasis added).[5]

The court decided by summary judgment that Mod. 164, as a matter of law, preserved claims for breach of warranty only. Construing ¶ 2, it ruled:

> [U]nder the Mod. 164 language the claim reserved was that of warranty only since the "any issue" language modifies the

"defective" and "nonconforming" language, which terms unambiguously signify warranty notions despite the fact that the term "warranty" is not used.... Manifestly, the saved claims are not ones for both breach of warranty *and* for breach of contract. Rather, the warranty-type language is limiting and definitive, not cumulative or collective.

Summary Judgment Order at 44. Although the court's analysis has some appeal, we disagree and find the terms "defective or nonconforming" ambiguous.

Those terms, as a matter of law, do not refer only to warranty concepts. In *Eastlake Constr. Co. v. Hess*, 102 Wash.2d 30, 686 P.2d 465 (1984), the Washington Supreme Court used the terms when it considered the appropriate measure of damages for a nonwarranty breach of contract claim. Among other instances, the court discussed the rule governing "defective construction," explaining that some "defects" cannot be remedied without great expense, and pointing to the "nonconforming insulation beneath the concrete floor" in the case before it. *Id.* 686 P.2d at 473.

The *Eastlake* court also adopted the measure of breach of contract damages in construction cases set forth in Restatement (Second) of Contracts, § 348 (1981). That section provides in pertinent part:

> (2) If a breach results in *defective* or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on
>
> . . . .
>
> (b) the reasonable cost of completing performance or of *remedying the defects* if that cost is not clearly disproportionate to the probable loss in value to him.

686 P.2d at 474 (emphasis added). *Eastlake* and other Washington cases demonstrate that the terms "defective" and "nonconforming" may be associated with breach of contract, as well as warranty

---

**4.** WPPSS argues that PDM's failure to implement its quality assurance program constitutes a material breach of Contract 213A in addition to a breach of warranty. That failure under a

breach of contract theory would entitle WPPSS to consequential damages.

**5.** The court stated that the parties agreed the term "and" may be omitted from ¶ 2.

claims. *See, e.g., Maryhill Museum of Fine Arts v. Emil's Concrete Constr. Co.,* 50 Wash.App. 895, 751 P.2d 866, 869–70 (1988) (following *Eastlake's* adoption of § 348 for determining breach of contract damages in construction cases); *see also Fuller v. Rosinski,* 79 Wash.2d 719, 488 P.2d 1061, 1063–64 (1971) (defective performance of contract to plant lawn and construct rock wall and alpine area), *overruled on other grounds, Eastlake,* 686 P.2d at 472–74; *Marine Enters. v. Security Pac. Trading Corp.,* 50 Wash.App. 768, 750 P.2d 1290, 1291 (1988) (defective refrigeration system).

Further, the court's conclusion loses its force when we view Contract 213A as a whole. *See McGary,* 661 P.2d at 974. The contract contains provisions in which the terms are not used as terms of warranty. For example, Contract 213A, GC ¶ 26.1 states in part:

> *Workmanship:* Work shall be performed by qualified workmen utilizing practices that will result in the specified quality of product. All workmanship shall be *free of defects* or faults.

(emphasis added). Contract 213A, GC ¶ 28.0 states in part:

> [PDM] shall, without charge, replace any material or correct any workmanship found by [WPPSS] *not to conform* to the Contract requirements, unless [WPPSS] consents to accept such material or workmanship with an appropriate adjustment in Contract Price.

(emphasis added). Such use of the terms outside the warranty clauses suggests that the court erred in finding the words "defective" and "nonconforming" *unambiguously* to preserve only warranty claims. Those words may be understood in more than one manner.

PDM argues that we should determine whether the terms are ambiguous in light of all surrounding circumstances. It con-

tends that Mod. 164 represented the culmination of lengthy negotiations resulting in the settlement of WPPSS's claims. The only claim left was the warranty claim. However, Washington law is clear that "[t]he intent of the parties to the contract is to be gleaned from the document itself, and *only* if it is ambiguous is parol evidence regarding the parties' actual intent admissible." *McGary,* 661 P.2d at 974 (emphasis added); *see Seattle Totems Hockey Club, Inc. v. National Hockey League,* 783 F.2d 1347, 1354 (9th Cir.) (applying Washington law), *cert. denied,* 479 U.S. 932, 107 S.Ct. 405, 93 L.Ed.2d 357 (1986); *Barnett v. Buchan Baking Co.,* 45 Wash.App. 152, 724 P.2d 1077, 1081 (1986), *aff'd,* 108 Wash. 2d 405, 738 P.2d 1056 (1987) (stating that court should determine parties' intent in an unambiguous contract from the language of the contract itself). We may resort to extrinsic evidence only after we conclude that a contract is ambiguous. *But see Continental Ins. Co. v. Paccar, Inc.,* 96 Wash.2d 160, 634 P.2d 291, 293 (1981) (finding a latent ambiguity when contract language becomes doubtful in light of extrinsic circumstances).

We conclude that the court erred in ruling that the terms "defective" and "nonconforming," as a matter of law, unambiguously signal warranty claims only. Because we find that the evidence of intent presented by the parties gives rise to conflicting inferences, summary judgment is improper. We reverse and remand this issue of the parties' intent to the district court.[6]

### 2. Whether 213A or 213B Warranties Govern Saved Claims

▮ The court ruled Mod. 164 ambiguous as to whether the warranty provisions of Contract 213A or 213B govern the reserved claims.[7] We find the court's reason-

---

**6.** Only after a court concludes that a contract is ambiguous must it "look for the intent of the parties by considering the subject matter and objective of the contract, the circumstances surrounding its making, the subsequent acts and conduct of the parties to the contract, and the reasonableness of the respective interpretations

advocated by the parties." *See, e.g., Universal/Land Constr. Co. v. Spokane,* 49 Wash.App. 634, 745 P.2d 53, 55 (1987); *Public Util. Dist. No. 1 v. WPPSS,* 104 Wash.2d 353, 705 P.2d 1195, 1209 (1985).

**7.** This issue is important because Contract 213B warranties limit more clearly the breadth of

ing persuasive and conclude that the language in Mod. 164 is ambiguous as to this issue.

As stated before, the parties in Mod. 164 settled claims arising from the performance of Contract 213A up to and including February 28, 1981 *excluding*:

> any issues between Owner and Contractor related to defective or nonconforming work accomplished prior to February 28, 1981 and [sic] that may arise from contractors *failure to properly implement the Quality Assurance Program as set forth in the 2808–213A by reference herein as applicable to this issue.*

Mod. 164, ¶ 2 (emphasis added).

WPPSS argues that this portion of ¶ 2 expresses unambiguously that the parties intended Contract 213A provisions to govern all reserved claims. It interprets the reference to 213A as defining what agreement would govern all saved claims. Emphasizing that Contract 213A governed work accomplished before February 28, 1981, it contends that the same contract should govern all claims related to that work.

On the other hand, PDM contends that Mod. 164 superseded and replaced the warranty provisions in Contract 213A with those of Contract 213B regardless of whether the work was performed under Contract 213A or 213B. Contract 213A provisions were "otherwise extinguished" by ¶ 8 of Mod. 164, which states in pertinent part:

> Delete the following specification pages and insert attached revised or added pages as follows:
>
> Delete: 1A Section [contains 213A warranty provisions] in its entirety
>
> Insert: 1A Section [contains 213B warranty provisions] in its entirety, FBS, 3/1/81.

It argues that the parties in Mod. 164 intended Contract 213B provisions to govern

any claims, or alternatively, that the language in Mod. 164 is ambiguous.

The court found the above portion of ¶ 2 ambiguous. It explained:

> That portion of ¶ 2 which states "as set forth in the 2808–213A by reference herein as applicable to this issue" falls squarely within Washington's broad definition of ambiguity. While it is manifest that 213B, at a minimum, applies to work accomplished after March 1, 1981 which was not done to correct defective work done before March 1st, the ambiguous reference in the same paragraph (2 of Mod. 164) to 213A read with or without the other provisions in 213A and 213B leave the construing reader with a choice of whether the parties intended to define performance and breach remedies of the saved 213A claims by reference to the otherwise extinguished provisions (213A) of the modified contract or by reference to the substituted 213B provisions. This is so since the phrase could be read as simply using 213A to define "Quality Assurance Program."

Summary Judgment Order at 38.

We agree with the court that the reference to 213A might define the quality assurance program requirements only, but that it might address available remedies as well. We find the language ambiguous. Reviewing the extrinsic evidence offered to assist with the interpretation of this ambiguity, we agree with the court's conclusion that neither party presented evidence that demonstrated unequivocally that either the warranties of Contract 213A or those of Contract 213B govern the saved claims. The court properly denied summary judgment.

### 3. Whether 213A Warranties Attached Before or After Completion of Work

At a trial bifurcated to address contract interpretation issues, a jury found that WPPSS had not established that the parties in Mod. 164 intended Contract 213A war-

---

WPPSS's breach of warranty action. Those warranties attached *after* completion and turnover of contract work. They also bar WPPSS's claims for consequential damages. On the other hand, troublesome language in Contract 213A

raises questions about when its warranties attached. WPPSS argued that they attached *before* completion of contract work. However, it failed to convince the jury of this interpretation.

ranties to govern any reserved claims. We affirm the court's denial of summary judgment on that issue and affirm the jury verdict. Therefore, we need not reach the issue whether the parties intended Contract 213A warranties to attach before *or* after completion and turnover of contract work.

### 4. PDM's Counterclaims

The court granted summary judgment in favor of PDM on its two counterclaims. In the first, involving retentions and unpaid invoices under Contracts 213A and 213B, PDM established successfully that WPPSS owed it $2 million. Although WPPSS appealed that ruling, its brief failed to argue the issue. The parties stipulated to dismissal of that portion of the appeal and we entered a Stipulation and Order to that effect on September 16, 1988.

In its second counterclaim, involving a separate contract for construction work on WNP–5, PDM established that WPPSS owed it $366,897 plus interest and sale taxes. Because we uphold the court's decision in *PDM II* in WPPSS's favor, we need not reach the contract interpretation issues raised by WPPSS relating to this counterclaim. *See infra* Part II.

### B. *Evidentiary Rulings*

*PDM I* proceeded to trial, bifurcated to address contract interpretation issues only. The court had barred WPPSS's breach of contract claims in its summary judgment order. Thus, the jury trial focused only on two preliminary contract questions. WPPSS bore the burden of proving by a preponderance of evidence (1) that the parties intended in Mod. 164 to have Contract 213A provisions govern WPPSS's preserved warranty claims, and (2) that, if 213A provisions governed, the parties intended those warranties to attach to nonconforming work discovered before the work was completed for turnover. The jury returned its verdict by special interrogatories against WPPSS.

WPPSS contends that the court committed reversible error in admitting or excluding certain proffered evidence at trial. We review those evidentiary rulings for abuse of discretion and find none. *Churchill v. F/V Fjord,* 857 F.2d 571, 578 (9th Cir. 1988).

### 1. Exclusion of Evidence of Quality Assurance Failures

■ WPPSS contends that the court erred in rejecting proffered evidence to support its contention that a major breakdown of PDM's quality assurance program had occurred at the time the parties negotiated Mod. 164. It argues that the extent of PDM's quality assurance problems is relevant to the issue of whether the parties intended Contract 213A or 213B to govern claims reserved under Mod. 164. Contrary to this contention, however, counsel for WPPSS said before trial:

> I agree we are not here to prove the fact of how the QA Program broke down or if it did or the extent to which it broke down or the dollar consequences. We are here to prove whether or not in realigning this contract with the creation of Mod # 164 the Supply System was setting out to reserve a claim under the A Contract.

Although the court allowed WPPSS to introduce evidence that the program experienced problems, it found WPPSS's proffered evidence of specific, substantial quality assurance failures not relevant to the limited issues before the jury: whether 213A or 213B warranties govern WPPSS's claims and whether 213A warranties attached before or after completion of work. The nature or extent of PDM's quality assurance problems was not an issue at trial. Given the limited issues at trial, the court's ruling was within its discretion. *See, e.g., United States v. Lopez,* 803 F.2d 969, 972 (9th Cir.1986) (court has broad discretion to determine whether evidence is relevant), *cert. denied,* 481 U.S. 1030, 107 S.Ct. 1959, 95 L.Ed.2d 530 (1987). Our conclusion obviously would not apply in a subsequent trial if the nature, extent or dollar consequences of PDM's quality assurance problems were an issue at trial.

### 2. Admission of Voysey's and Verderber's Statements

■ Over WPPSS's objection, the court admitted deposition testimony of Voysey

and Verderber as to their understanding at the time of negotiations how Contract 213A warranties were to work. They were responsible for the negotiation of 213A on WPPSS's behalf. WPPSS argues that the court erred in admitting the statements because they were inadmissible legal conclusions and opinions.

Denying WPPSS's motion *in limine,* the court concluded that the statements qualified as admissions under Fed.Rule Evid. 801(d)(2) and thus the "legal opinion rule" was not a bar. WPPSS later convinced the court that the testimony could not come in as a party admission. The court ruled finally that it would allow testimony as to what the men understood were PDM's obligations under 213A based on their beliefs at the time of the negotiations. *Cf. McGary,* 661 P.2d at 975 (permitting plaintiffs to testify that they understood the parking spaces at issue to be provided free of charge). It would reject testimony based on their subsequent construction of 213A.

The court reviewed the disputed statements in the depositions, ruling on their admissibility line by line. It permitted testimony only as to what the negotiators believed were PDM's obligations based upon their state of mind at that time. After reviewing the statements at issue, we conclude that the court did not commit reversible error in allowing the jury to hear that testimony. *See Kisor v. Johns–Manville Corp.,* 783 F.2d 1337, 1340 (9th Cir. 1986).

The court may have also excluded this evidence on the ground that there was no evidence that any limitations on their authority had been communicated to PDM. Regardless of limitations on their authority, Voysey and Verderber's beliefs about PDM's obligations under 213A would be the same. The existence of any actual limitations on their negotiating authority would not affect the credibility of their testimony as to their contemporaneous beliefs about PDM's obligations under 213A. Since these limitations were not communicated to PDM, the court had to balance the probative value of their testimony against any prejudice from the jury's impression that they had actual authority. We conclude that the court acted within its discretion in excluding this evidence on this basis also. *See Kisor,* 783 F.2d at 1340.

3. Exclusion of Evidence of Voysey's and Verderber's Limited Negotiating Authority

■ WPPSS contends that the court erred in rejecting its proffered evidence relating to the limited extent of Voysey's and Verderber's actual negotiating authority. Prior to trial, however, WPPSS had never challenged their authority as negotiators of Contract 213A. The court in its previous order had found as an undisputed fact that Voysey and Verderber "were responsible for negotiation of 213A on behalf of [WPPSS]." WPPSS did not challenge this finding in its motion to revise the court's order. In fact, WPPSS did not raise this argument any time before trial. The court acted within its discretion in refusing to allow WPPSS to pursue that argument after trial had begun.

II. PDM–II: PDM's CROSS–APPEAL (The Collection Action)

*Factual Background*

WPPSS adopted resolutions for the construction and operation of several utility projects. Those resolutions set forth a system for the construction and financing of the projects, including authorization for the sale of revenue bonds. The resolutions established the separate projects as separate utility systems. Each resolution established "special funds" of the projects' revenues, receipts and income. Those proceeds were held in trust to pay principal and interest on the revenue bonds, as well as the costs of construction, operation and maintenance of the projects, among other purposes.

In February 1977 WPPSS adopted Resolution 890, providing for the financing and construction of WNP–4 and WNP–5. That resolution provided for the creation and issuance of revenue bonds to raise capital for WNP–4/5 and for various special funds from which WPPSS was to pay the obli-

gations of those projects. Specifically, Resolution 890 created the WNP–4/5 Construction Fund, Revenue Fund, Bond Fund, and Reserve and Contingency Fund. WPPSS applied the proceeds from the bonds to the projects' construction costs, including its obligations to PDM for construction work performed on WNP–5.

In December 1977 WPPSS and PDM entered into Contract 218. PDM agreed to design, furnish materials and install fuel pool liners at WNP–3 and WNP–5. Consistent with Resolution 890 and WNP–3's resolution, that contract distinguished between work on each of the separate units.

After the termination of WNP–4/5 in January 1982, WPPSS and PDM executed Modification (Mod.) 33 to settle all claims arising out of Contract 218. Mod. 33 in pertinent part provides:

> Owner does recognize an obligation to pay the Contractor $366,897 plus applicable sales taxes thereon in full consideration of all claims alleged and made by the Contractor relative to Unit 5, except as expressly referred to in Item 5 hereof. Owner represents that presently no funds are available on Unit 5 and owner further represents that it is unknown when and if funds will be available. Accordingly, the sum of $366,897 shall bear interest at the rate of one (1) percent per month from the date of execution of this contract modification until the date payment is made to the Contractor. *Contractor shall pursue collection of these Unit 5 obligations only against the owner and/or the entities participating in Unit 5.*

Mod. 33, ¶ 4 (emphasis added).

### Procedural Background

In response to WPPSS's breach of contract and warranty actions (*PDM I*), PDM filed a permissive second counterclaim for the debt owed by WPPSS under Contract 218. Based on the settlement terms of Mod. 33, the court concluded that the parties had agreed that WPPSS owed PDM $366,897 plus interest and sales tax for work done on WNP–5 and that Mod. 33 did not limit the source of PDM's payment to WNP–5 revenue funds only. Granting summary judgment in favor of PDM, the court did not limit expressly the funds from which PDM could collect its judgment.

WPPSS moved to revise the court's order on the counterclaim and argued that Washington law limited PDM to levying execution on its judgment only from WNP–5 revenue funds. In response, PDM encouraged the court to defer ruling on the question whether it could recover from funds of projects other than WNP–4/5. In subsequent rulings, the court adopted PDM's position and clarified its order to emphasize that it had not determined in *PDM I* what funds PDM could reach to satisfy its judgment because that was a collection matter.

After attempting unsuccessfully to collect its judgment because WNP–4/5 had no funds, PDM brought a separate collection action, *PDM II.* The parties filed cross-motions for summary judgment and the bond fund trustee for WNP–1, –2, –3 bondholders filed an amicus brief. PDM argued that the court in *PDM I* had awarded it a general judgment and that Washington law and Mod. 33 did not restrict the source for collection. WPPSS argued that the special fund doctrine limited PDM's collection efforts to WNP–4/5 revenue funds.

The court denied PDM's motion for summary judgment "to the extent it seeks access to revenue funds from projects other than WNP 4 and 5" and dismissed *PDM II* in WPPSS's favor. It concluded that Resolution 890 was binding on PDM and that, pursuant thereto, PDM's judgment reflected only a WNP–4/5 obligation. Collection was restricted to the WNP–4/5 Construction Fund and Revenue Fund, the "special funds" created to pay all WNP–4/5 construction obligations.

### Analysis

A. *Preclusion Claim*

■ PDM contends that the court's ruling in *PDM I* deprived the court of jurisdiction in *PDM II* to limit PDM's collection to WNP–4/5 funds. That argument lacks merit.

"This court has held that a federal court sitting in diversity must apply the res judicata law of the state in which it sits." *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982); *see St. Paul Fire & Marine Ins. Co. v. Weiner*, 606 F.2d 864, 868 (9th Cir. 1979) (applying that rule where the prior action was in federal court). Washington law dictates what preclusive effect we give the prior judgment in *PDM I*.

PDM argues that WPPSS's defenses relating to limitations on its collection efforts "merged" into the judgment entered on its second counterclaim in *PDM I*. It relies primarily on *Caine & Weiner v. Barker*, 42 Wash.App. 835, 713 P.2d 1133, 1134 (1986), which states that generally "when a valid final judgment for the payment of money is rendered, the original claim is extinguished, and a new cause of action on the judgment is substituted for it." PDM, however, fails to acknowledge that the collection issue did not merge into the judgment because the parties did not and could not litigate that issue.[8]

The court in *PDM I* expressly reserved ruling several times on the collection issue.[9] When a court reserves a question for further adjudication, a judgment does not bar subsequent determination of that question. *Curtiss v. Crooks*, 190 Wash. 43, 66 P.2d 1140, 1144 (1937); *State v. Drake*, 16 Wash.App. 559, 558 P.2d 828, 831 (1976); *see* Restatement (Second) of Judgments, § 26(1)(b) (1982) (stating that no merger occurs to extinguish a claim when "[t]he court in the first action has expressly re-

served the plaintiff's right to maintain the second action"). The court's decision in *PDM II* addressed only this reserved issue. We find no preclusion.

## B. Special Fund Doctrine[10]

### 1. The Construction Fund

■ Relying on the "special fund doctrine," the district court limited the source from which PDM could collect its judgment to the "Construction" and "Revenue" Funds of WNP–4/5. PDM argues that the special fund doctrine does not apply and that Mod. 33 obligated WPPSS to pay from other funds.

WPPSS is a joint operating agency formed under Wash.Rev.Code § 43.52.360. It is a municipal corporation and, with few exceptions, has all the powers granted a public utility district. *See* Wash.Rev.Code §§ 43.52.360; 43.52.391. It may create special funds for varied purposes, including the construction of a utility. *See* Wash. Rev.Code §§ 43.52.375; 43.52.3411; 54.24.-018(3); 54.24.030(1); 54.24.040; 54.24.050.

The special fund doctrine applies to joint operating agencies. *See Public Util. Dist. No. 1 v. WPPSS*, 104 Wash.2d 353, 705 P.2d 1195, 1206 (1985). Once created, a special fund generally may not be used for any other purpose and the claims payable from it are usually not payable from another fund. *Id.* (citing 15 E. McQuillin, *Municipal Corporations* § 39.45 (3d ed. 1985)).

Resolution 890 established WNP–4/5 as a separate utility and the "Projects Con-

---

**8.** Further, we find that WPPSS created a special fund from which *all* construction costs were to be paid. That special fund is the only source of revenue from which PDM may satisfy its judgment. *See infra* Part II, Section B. *Caine* even acknowledges that "where the original obligation provides for special rights or exemptions, in some circumstances these may be preserved and recognized despite merger." 713 P.2d at 1135.

**9.** When PDM sought judgment on its WNP–5 claim in *PDM I*, WPPSS raised the collection limitation issue. In response, PDM argued that the issue would affect "only PDM's ability to *collect* such a judgment. That issue is not yet before the Court." PDM's Reply Memorandum

at 8 (Oct. 21, 1985) (emphasis in original). Following the court's grant of summary judgment in *PDM I*, WPPSS moved to revise the court's order to include the restrictions imposed by Washington law on the funds available to pay PDM's claim. The court then clarified its order to emphasize that it had not determined in *PDM I* what funds PDM could reach to satisfy its judgment. *See* Order Granting in Part Motion to Revise at 6 (Apr. 18, 1986). The court reiterated its decision to reserve ruling on such collection matters.

**10.** We do not address all arguments advanced by the parties because the special fund doctrine resolves the question presented.

struction Fund" as a special fund. *See WPPSS*, 705 P.2d at 1201 n. 4, 1210. To determine whether the special fund doctrine applies, we employ a four-step analysis. *See id.* at 1206–11. First, the joint operating agency must have the power to create the special fund. Next, it must create the special fund. Third, the revenues pledged to the fund must not include revenues from other projects. Finally, it must assign the money to create a lien.

The Construction Fund meets these requirements. First, the language and policy behind the statutes governing joint operating agencies indicate that WPPSS has the power to create a special fund to pay the cost of construction for WNP–4 and WNP–5. *See* § 43.52.3411; § 54.24.030; *WPPSS*, 705 P.2d at 1207, 1210.

Next, viewing Resolution 890 as a whole, the parties created a special fund. They intended to establish a special fund to pay the cost of construction of each project and intended to limit the funds pledged to the Construction Fund. Section 6.8 of Resolution 890 states in part:

*Construction Fund; Application of Proceeds and Sale of Bonds.* There is hereby created a *special fund* of the System to be known as the "Projects Construction Fund" (hereinafter referred to as the "Construction Fund"), which shall be held in trust by the System.

(emphasis added). Section 6.9 of Resolution 890 states in part:

*Cost of Construction.* Payment of the Cost of Construction of each Project *shall be made* from the moneys in the Construction Fund.

(emphasis added). The directory term "shall" mandates payment from the Construction Fund. *See WPPSS*, 705 P.2d at 1206. Together these two sections demonstrate that the parties intended this fund to be the sole source of payment of construction costs. *See id.* at 1209. These sections also demonstrate that the parties intended to limit the funds pledged for payment of the construction costs to the Construction Fund.

Third, the language of Section 6.8 of Resolution 890 demonstrates that the par-

ties limited the pledge to the revenues of WNP–4/5. Section 6.8 refers to funds deposited to the Construction Fund. Only revenues from bonds issued in connection with WNP–4/5 go into the fund. The conclusion that the parties limited the pledge to WNP–4/5 revenues is also consistent with the statutory scheme because WNP–4/5 is a separate utility. *WPPSS*, 705 P.2d at 1210.

Finally, Wash.Rev.Code § 54.24.040 demonstrates the legislature's intent to assign funds pledged to a special fund by a joint operating agency. The statute provides:

It is the intention hereof that *any pledge* of the revenues or other moneys or obligations *made by a district* shall be valid and binding from the time that the pledge is made; that the revenues or other moneys or obligations so pledged and thereafter received by the district *shall immediately be subject to the lien of such pledge* without any physical delivery or further act, and that the lien of any such pledge shall be valid and binding as against any parties having claims of any kind in tort, contract, or otherwise against a district irrespective of whether such parties have notice thereof. Neither the resolution nor other instrument by which a pledge is created need be recorded.

(emphasis added).

Although the *WPPSS* court relied on a resolution rather than a statute for the assignment of funds, this difference does not affect the outcome here. *WPPSS* held that Resolution 1199 equitably assigned the funds pledged. Section 54.24.040 tracks the language of that resolution. Resolutions of municipal corporations are similar to legislative acts. One dealing with the corporation has notice of its resolutions. *See, e.g., State ex rel. Bain v. Clallam County Bd. of County Comm'rs*, 77 Wash. 2d 542, 463 P.2d 617, 621 (1970). WPPSS's board exercises the joint operating agency's legislative power, and its resolutions become a matter of public record. *See* § 43.52.360; *Clallam*, 463 P.2d at 621. As in Resolution 1199 in *WPPSS*, here the interaction of Resolution 890 and section

54.24.040 equitably assigns the funds pledged.

PDM argues that in *WPPSS* an agreement specifically required payment from a special fund. It argues that the special fund doctrine does not apply because Mod. 33 has no similar limitation.

Although the court in *WPPSS* examined the agreement as one of the documents, it did not hold that the special fund doctrine required the parties to limit payment contractually to proceeds out of the special fund. There the parties executed the agreement as part of the entire transaction creating the fund. *See* 705 P.2d at 1207. The court examined *all* documents to ascertain the parties' intent. Here, the Construction Fund was created seven years before Mod. 33 existed. Mod. 33 has no bearing on whether the parties intended to create a special fund when Resolution 890 was executed.

PDM argues that Mod. 33 obligated WPPSS to pay the counterclaim regardless of the existence of the Construction Fund. It argues that WPPSS may incur general obligations and that Mod. 33 created one.

That argument ignores the status of joint operating agencies as municipal corporations and the application of the special fund doctrine to this case. Because Resolution 890 created a special fund for the payment of the "Cost of Construction," Mod. 33 does not apply. PDM was bound by notice of the limitations imposed on WPPSS by Resolution 890's provisions dealing with the Construction Fund. *See Clallam*, 463 P.2d at 621; *Findley v. Hull*, 13 Wash. 236, 43 P. 28, 29 (1895). In effect, the resolution became a contractual provision that the parties could not alter. *See, e.g., Soule v. City of Seattle*, 6 Wash. 315, 33 P. 384, 386 (1893).

Assuming, as PDM argues, that WPPSS had the power and the requisite intent to create a general obligation, it would have been an invalid attempt by WPPSS to contract beyond its authority. In *Pratt v. Seattle*, 111 Wash. 104, 189 P. 565, 570 (1920), a deficiency resulted when Seattle could not collect part of a special assessment for street improvements. A later or-

dinance assumed the deficiency as a general indebtedness. The court said:

[T]he special assessment obligation was not one that the city had power to voluntarily assume after the completion of the local improvements; they having been initiated and carried to completion with the avowed purpose on the part of the city that their entire cost shall be paid for from funds to be raised by special assessments against property benefited thereby.

*Id.* 189 P. at 571. In light of *Pratt*, WPPSS, after creating the Construction Fund, could not assume the deficiency by contract. *See also Lester N. Johnson Co. v. City of Spokane*, 22 Wash.App. 265, 588 P.2d 1214, 1220 (1978).

### 2. *The Revenue Fund*

Although the district court acknowledged that the Construction Fund language lends itself to exclusivity, it held that PDM could also collect from the Revenue Fund. It relied on the following language from Resolution 890:

Section 6.1 *Revenue Fund* ... all such income, revenues, receipts, profits and other moneys ... shall be used and applied ... for the purpose of paying *all other charges or obligations against said revenues, income, receipts, profits and other moneys of whatever nature now or hereafter imposed thereupon by law or contract*, to the payment of which for such purposes said revenues, income, receipts, profits and other moneys are hereby pledged."

(emphasis added). That conclusion would make the special fund doctrine inapplicable because that doctrine requires payment of the construction costs solely from one fund. We reverse the court's ruling on this issue.

Section 6.9, discussing the Construction Fund, states in part: "Payment of the Cost of Construction of each Project *shall* be made from the moneys in the Construction Fund." As discussed earlier, the term "shall" mandates payment from the Construction Fund. We observe that section 1.1(h) defines "Cost of Construction" as

"all costs paid or incurred by [WPPSS] in connection with the planning, acquisition and construction of the Projects, and the costs of Capitalized Fuel, as such costs are defined in Section 6.9 of this Resolution. Section 6.9 includes numerous items within the definition of WPPSS's Cost of Construction for the No. 5 Project. We conclude that the debt owed by WPPSS to PDM falls within the definition of the Cost of Construction.

The broad language of Section 6.1 suggests that the Revenue Fund might also cover the cost of construction. In construing Resolution 890, we must view the document as a whole. *See WPPSS*, 705 P.2d at 1210. We must harmonize seemingly inconsistent language where possible. *Grant County Constructors v. E.V. Lane Corp.*, 77 Wash.2d 110, 459 P.2d 947, 953 (1969). The more reasonable interpretation is preferred. *See WPPSS*, 705 P.2d at 1209. The specific language of the Construction Fund controls over the more general language of the Revenue Fund. *See Washington Local Lodge No. 104 v. International Bhd. of Boilermakers*, 28 Wash. 2d 536, 183 P.2d 504, 507 (1947) (citing Restatement of Contracts § 236).

We conclude that the general language of the Revenue Fund provides a special fund for any claims or obligations not covered by any other special fund. The broad language of the Revenue Fund appears to cover any charge or obligation against WNP-4/5. Yet, this interpretation would invalidate the Revenue Fund as a special fund and other WNP-4/5 special funds. An unrestricted interpretation of the language of the Revenue Fund would provide a second fund for claims payable out of other WNP-4/5 special funds.

The only reasonable interpretation available, viewing the document as a whole, requires that the Revenue Fund pay claims or obligations not covered by any other special fund. The parties clearly intended to create several special funds and our construction harmonizes the Revenue Fund language with this intention.

AFFIRMED in part, REVERSED in part and REMANDED.